UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MELISSA FORCIER,                                   :
              Plaintiff,                     :
                                    :
               v.                           :   C.A. No. 16-121S
                                      :
ARMAND E. BINETTE, in his official capacity as :
Senior Housing Inspector of the Minimum            :
Housing Division of the City of Woonsocket, Rhode :
Island, and the CITY OF WOONSOCKET,                :
RHODE ISLAND,                                       :
                   Defendants.              :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

       This case poses the question whether the occupant of an uninhabitable building who is ordered to vacate by a municipal official acting to abate an immediate hazard to health, safety and welfare possesses a constitutional property right implicating the Fifth Amendment[1] ban on taking property without just compensation, and the Fourteenth Amendment[2] ban on the deprivation of property without procedural or substantive due process of law.  Despite having no ownership interest and no lease with any person rightfully asserting an ownership interest, Plaintiff claims that she occupied her unit in the uninhabitable building as a tenant at sufferance. Based on that status, she alleges that she had a constitutional property right to occupy and that the notice ordering her to vacate the unit, the municipality's failure to conduct a hearing for her to challenge the uninhabitability determination, and the inadequate offer of alternative housing she received after being compelled to leave were all constitutionally deficient.

---

[1] The relevant language in the Fifth Amendment states, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.

[2] The relevant language in the Fourteenth Amendment states, "nor shall any State deprive any person of . . . property, without due process of law."  U.S. Const. amend. XIV, § 1.

Before the Court is the motion to dismiss of Defendants City of Woonsocket, Rhode Island, and Armand E. Binette, in his official capacity as the City's Senior Housing Inspector of the Minimum Housing Division (collectively "Woonsocket").  The motion challenges the plausibility both of Plaintiff's claim that she was a tenant at sufferance and of her assertion that her occupancy of the unit conferred on her a property right sufficient to entitle her to damages under 42 U.S.C. § 1983 for the alleged injury caused by Woonsocket's failure to provide adequate notice, a hearing or a legally-sufficient offer of alternative housing.  The motion also asks the Court to dismiss Plaintiff's substantive due process claims, as well as her claims against Defendant Binette in his official capacity.  Finally, with no federal claims remaining, Defendants ask the Court to decline to retain Plaintiff's state law claims.

I.      **Factual and Procedural Background**[3]

On March 11, 2014, Plaintiff entered into what she believed was a rental agreement permitting her family to occupy a condominium unit in a three-story/six-unit building on Social Street in Woonsocket.  Verified Complaint ("VC") ¶ 25.  The "agreement" was with two individuals who told her the rent would be $900 per month, excluding utilities.  VC ¶ 25.  The unit was actually owned by Wells Fargo Bank, which had foreclosed in 2013 on the former true owner – a woman who had no relationship to either of the scofflaws who purported to rent to Plaintiff.  VC ¶ 26.  When Plaintiff later learned that the scofflaws did not own and had no right to rent the condominium, she stopped paying rent in July 2014.[4]  VC ¶ 26.  However, she

---

[3] These facts are drawn from well-pleaded factual averments in the complaint, which, together with the reasonable inferences flowing from them, are assumed to be true for purposes of this motion.

[4] The complaint alleges that, at some point, Plaintiff complained to Woonsocket code enforcement about bedbugs and roaches and the two scofflaws sent exterminators.  VC ¶ 28.  While the complaint is silent regarding the timing of this incident, this allegation appears to corroborate her claim that she had been duped by the scofflaws into believing that she was a true tenant until July 2014.

2

continued to live in the unit, making occasional repairs (replacing the hot water heater, the faucets, the shower head and the kitchen floor) at her own expense.  VC ¶ 27.

In the fall of 2014, Woonsocket issued a notice of code violations addressed to the "property owner."  A follow-up notice was issued in May 2015.  VC ¶ 53 & Exs. 5-6.  Although Plaintiff attached copies of these notices, her complaint does not explain how she got them or when she became aware of code issues not being addressed by an owner.  The attached copy of the 2014 notice is so blurry that it is impossible to ascertain what code violations were listed; nevertheless, the complaint alleges that the code violations cited in the fall of 2014 had still not been addressed by February 2016, when the events in issue took place.  VC ¶¶ 32, 53 & Ex. 4. That is, after these two notices of code violations were sent, nothing happened.  No one – not Wells Fargo, not Plaintiff, not the scofflaws, not Woonsocket, and not any other occupant of the building – did anything to address the violations.

On February 15, 2016, a year and a half after she stopped paying rent and more than a year after the first notice of code violations, Plaintiff called the Woonsocket Fire Department about a burst water pipe in the basement of the building.  VC ¶ 29.  The following day, Defendant Binette inspected the building and observed an array of very serious issues, including no running water and a serious leak in a second floor unit, trash and debris in the halls, trash bags on the landings, holes in the walls, broken hand rails, a couch blocking access to a third floor unit, broken doors and windows, an overflowing dumpster, and mattresses, box springs, furniture, trash, debris and junked cars in the yard.  VC ¶ 30 & Ex. 3.  On February 17, 2016, Defendant Binette returned to the building and observed that the burst water pipe was fixed but the other serious problems remained; during that visit, he told Plaintiff that the building would soon be condemned.  VC ¶ 31.

On February 18, 2016, Plaintiff received a written "immediate compliance" order pursuant to Woonsocket Code § 12-47 and R.I. Gen. Laws § 45-24.3-19(b)(2)[5] addressed to "All tenants," advising that, due to the lack of "a responsible property owner" and the unaddressed "sanitation issues" both inside and out, the building had been found to be unfit for human occupancy.  VC ¶¶ 32-34 & Ex. 4.  In all capital letters, the notice advised Plaintiff that five days thence, on February 23, 2016, the utilities would be turned off, the building secured and placarded, and all occupants remaining would be removed, by the police if necessary. According to the notice, the violations included not only those cited in the fall of 2014, which remained unresolved, but also new problems, including "serious sanitation issues," broken doors and windows and unregistered vehicles.  The notice advised recipients that anyone seeking "additional information" could contact the "Senior Housing Inspector" and provided details for how to reach him.  VC ¶¶ 32-34 & Ex. 4.

Plaintiff followed up the very next day – February 19, 2016 – with an informal conference with Defendant Binette during which she asked for more time to move out.  Because he believed the building was uninhabitable, he refused.  VC ¶ 35.  The next day she unsuccessfully looked for another apartment for her family, which included herself, her husband, their four children (under age seven), and the dog.  VC ¶¶ 5, 37.  On February 22, 2016, she finally began to move their possessions, hiring movers, renting a U-Haul and arranging for a storage unit; however, she did not succeed in removing everything by February 23, 2016.  VC ¶¶

---

[5] The February 18, 2016, notice contains a mysterious citation to Section 108.13 of the "Rhode Island Property Maintenance Code," which does not appear to be drawn from Rhode Island law.  Internet research suggests that this is a citation to a model code known as the "International Property Maintenance Code."  See http://www.sdmunicipalleague.org/vertical/Sites/%7B2540DC39-A742-459F-8CAF-7839ECF21E89%7D/uploads/2015_Updated_IPMC_Session.pdf (viewed January 18, 2017).  Fortunately, the reference is not inconsistent with applicable law, which may be found in the Rhode Island Housing Maintenance and Occupancy Code, R.I. Gen. Laws § 45-24.3-19, and in the Woonsocket Minimum-Standards Housing Ordinance, Woonsocket Code § 12-1, et seq.  In this opinion, I cite to the applicable provisions of the Rhode Island statute and the Woonsocket ordinances, not to the "International Property Maintenance Code."

38-40.  On February 23, 2016, Woonsocket officials arrived to empty the building and turn off

the utilities.  Although they left her unit to be the last one vacated, she was still packing when

she was told she had to go.  VC ¶ 41.  As soon as she departed at 1:30 p.m., leaving behind

furniture and other belongings, the building was boarded up.  VC ¶¶ 42-43.

At some point during the day of February 23, 2016, a reporter from the Woonsocket Call

suggested that Plaintiff contact the Woonsocket Director of Human Services about finding

emergency shelter.  That office immediately secured funding for Plaintiff and her family to stay

at the Woonsocket Motor Inn for five days, from February 23 to 28, 2016.  VC ¶ 45.  The

complaint does not specify precisely when Human Services arranged this alternative housing but

it permits the inference that it was sometime after 1:30 p.m., that is, after the execution of the

order to vacate.[6]  After the city's subsidy ran out, Plaintiff stayed on at the Woonsocket Motor

Inn at her own expense through March 12, 2016.  VC ¶ 47.  Woonsocket offered Plaintiff no

meaningful assistance in her search for permanent housing, beyond an offer of funds to assist

with a security deposit.  VC ¶¶ 45-46.

Meanwhile, on March 11, 2016, Plaintiff initiated this action, filing the verified

complaint and request for injunctive relief.  Her motion for temporary restraining order was

heard on March 15, 2016.  After Woonsocket agreed to provide her with alternative housing and

to pay for temporary housing in the interim, it was denied as moot.  See Text Order of May 10,

2016.  What remains in issue is Plaintiff's claim for damages arising from the alleged

---

[6] The best sources on which to base this inference are the allegations in which Plaintiff describes herself as packing and moving beds to her mother-in-law's home during the time leading up to 1:30 p.m., permitting the inference that she was too busy to talk to a Woonsocket Call reporter or to contact the Woonsocket Human Services Director before she left the building.  VC ¶¶ 40-41.  In addition, she alleges that she called United Way about space in homeless shelters after leaving her apartment.  VC ¶ 44.  The problem is that, while the complaint is otherwise very clear about whether certain events occurred before or after 1:30 p.m., it is vague about the critical timing of the communication with Human Services during which Plaintiff concedes that Woonsocket offered her alternative housing, albeit for less time than she claims is required by state law.  Nevertheless, for purposes of this motion, I accept that the complaint adequately alleges that the offer of alternative housing came after the execution of the order to vacate.

constitutional deprivations that occurred as she was forced to vacate the Social Street unit on February 23, 2016.

Plaintiff's federal claims arise under 42 U.S.C. § 1983, which provides protection against constitutional violations by persons acting under color of state or other local law.  Plaintiff alleges that she had a constitutional "property interest" in the condominium unit that she and her family occupied, arising from her status as a tenant at sufferance and as an occupant of the dwelling.  She charges that, consistent with its alleged policy and practice of forcing tenants out of condemned buildings under threat of arrest without notice, a meaningful opportunity to be heard or just compensation for the loss of property, Woonsocket deprived her of her property interest in violation of her rights under the Fifth and Fourteenth Amendments to the Constitution. Specifically, she claims that she was not provided with at least ten-days prior notice of the requirement to vacate; that she was not told in writing of her right to a hearing to challenge the determination that the building was uninhabitable; that she was denied her right to a hearing in that no hearing was held; and that she was not provided with an adequate or timely offer of alternative housing.  VC ¶¶ 50-53, 57.  She also charges that Woonsocket never actually placed a placard on the building; rather, after forcing the occupants out, it cleaned up the sanitation problems and made repairs at its own expense (placing a lien on the building) but still refused to allow Plaintiff to move back in.  VC ¶¶ 51, 54-55.  Plaintiff also asserts state law claims.

## II.    State and Municipal Procedural Remedies

Rhode Island and the City of Woonsocket have similar detailed procedures governing the condemnation of uninhabitable structures, both of which provide certain protections for displaced occupants.  The public policy underpinning both is based on the proposition that there is no right to occupy housing that is unfit for human occupancy.  See Rhode Island Housing

Maintenance and Occupancy Code, R.I. Gen. Laws § 45-24.3- 1, *et seq.* ("the Rhode Island Occupancy Code"); § 45-24.3-13 ("No person shall occupy as owner or occupant, or let to another for occupancy, any vacant dwelling or nonresidential structure, unless it and the premises are clean, sanitary, fit for human occupancy . . . ."); Woonsocket Code § 12-4 ("establishing minimum standards . . . essential to make dwellings safe, sanitary, and fit for human habitation . . .").

The Rhode Island Occupancy Code authorizes municipalities to adopt rules and regulations to carry out these purposes.  R.I. Gen. Laws § 45-24.3-16(a).  It vests discretion in a designated municipal "enforcing officer" to determine that a building "shall be designated as unfit for human habitation" based on parameters laid out in the statute, including that it is unsanitary.  R.I. Gen. Laws § 45-24.3-19(b).  The Woonsocket ordinance names as its enforcing officer the "chief inspector" in the division of minimum housing standards of the public safety department, who is authorized to act based on a determination that a housing violation requires immediate action to "abate a direct hazard, or immediate peril to the health, safety or welfare of the occupants of the dwelling."  Woonsocket Code §§ 12-23 to 12-24; 12-47.  Defendant Binette is Woonsocket's designated "enforcing officer."

Once the building is determined to be uninhabitable, the Rhode Island Occupancy Code provides that the enforcing officer must order it vacated "within a reasonable time," which may be no more than thirty days.  R.I. Gen. Laws § 45-24.3-19(b)(2).  It further provides that any person affected by the designation of a building as uninhabitable is entitled to appeal through an informal conference with the enforcing officer and/or a hearing before the housing board of review.  R.I. Gen. Laws § 45-24.3-21.  Either avenue of appeal must be initiated within ten days of the issuance (for the informal conference) or service (for the hearing) of the notice or order to

vacate.  An aggrieved occupant who pursues an informal conference may also request a hearing

by filing "with the housing board of review a petition stating that person's reasons for contesting

the notice or order."

The Rhode Island Occupancy Code affords special protection to anyone occupying[7] the

condemned building at the time the order issues: "[n]o dwelling shall be vacated . . . by the

enforcing officer . . . until persons occupying the dwelling at the time the compliance order is

issued have been offered housing accommodations in a decent, safe, and sanitary dwelling."[8]

R.I. Gen. Laws § 45-24.3-19(d).  At least one superior court order has interpreted the alternative

housing requirement to mandate notice to the occupants, "[w]henever possible," at least thirty

days before the condemnation occurs, and, in cases of emergency when thirty-days' notice is not

possible, to require that the alternative housing arrangements must be "for as long as needed, up

to a period of thirty days."  Gomes v. Shamoon, C.A. 04-2068, Order at 2 (R.I. Super. Ct. July

26, 2004) (a copy of this unpublished court order is appended to the complaint at ECF No. 1-1 at

2-4) ("Gomes").

Under the Woonsocket ordinance, when the chief inspector makes a finding that a

dwelling is uninhabitable, an order to vacate must issue.  Woonsocket Code § 12-69.  In the

---

[7] The statute defines an occupant as any person who is not a mere guest, is over the age of one and has been "living, sleeping, cooking, or eating in, or actually having possession of, a dwelling unit."  R.I. Gen. Laws § 45-24.3-5(27). The parties do not dispute that Plaintiff was an occupant within the meaning of the Rhode Island Occupancy Code.

[8] I have interpreted the identical language of R.I. Gen. Laws § 45-24.3-19(d) and Woonsocket Code § 12-80 – "no dwelling shall be vacated . . . until persons occupying the dwelling at the time the compliance order is issued have been offered housing accommodations" – to require that the alternative housing offer must be made before the order to vacate is executed.  Arguably, by focusing on the phrase "at the time the compliance order is issued," these provisions could be interpreted to require that the offer must be made even earlier, when the order issues.  Such an interpretation is contrary to basic principles of statutory construction.  See Lockhart v. United States, 136 S. Ct. 958, 962 (2016) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").  Because it is clear that the phrase "at the time the compliance order is issued" modifies the words that immediately precede it ("persons occupying the dwelling"), both R.I. Gen. Laws § 45-24.3-19(d) and Woonsocket Code § 12-80 mean that the right to the offer of alternative housing is limited to persons occupying the dwelling at the time the order issues, rather than that the offer of alternative housing must be made at the time the order issues.

absence of an emergency, the order to vacate must be served on the occupants at least ten days before the effective date; an appeal from the order to vacate may be taken to the housing board of review within ten days after service.  Woonsocket Code §§ 12-69, 93.  The order-to-vacate provision does not require that the occupants be advised of their right to appeal the order.[9] Woonsocket Code § 12-69.  The condemned building must be placarded and vacated in a reasonable time as determined by the chief inspector.  Woonsocket Code § 12-70.

If the chief inspector determines that conditions in the building present an immediate peril to health and safety, an "immediate compliance order" issues.  Woonsocket Code § 12-47. An immediate compliance order permits the city to dispense with the ten-day notice.  Instead, the immediate compliance order may be effective immediately or "in such time as the chief inspector shall, under the circumstances, deem reasonable, necessary and proper."  Id.  Such an order may include an order to vacate addressed to the building occupants; if so, "any person upon whom an immediate compliance order is served shall comply therewith immediately or otherwise as such order may specify."  Id.  While any person served with an immediate compliance order has the right to appeal to the housing review board, the ordinance does not require that the emergency order advise occupants that they have the right to seek an appeal.  The appeal must be initiated within ten days of service of the order.  Woonsocket Code § 12-93.  The appeal automatically stays the effect of the order unless the chief inspector certifies that there is an immediate peril to health or safety, in which event the stay requires a restraining order and the appeal must be expedited.  Woonsocket Code § 12-95.

The Woonsocket ordinance has a verbatim replica of the Rhode Island Occupancy Code, § 45-24.3-19(d), that provides special protection for occupants displaced by the condemnation of

---

[9] This contrasts with the requirement for a "notice of violation," which must advise "the person to whom it is directed of his right to apply for a hearing before the chief inspector and the procedure by which application for such hearing can be made."  Woonsocket Code §§ 12-45, 49.

a building.  It provides that, "no dwelling shall be vacated . . . by the chief inspector . . . until the persons occupying the dwelling . . . have been offered housing accommodations in a decent, safe and sanitary dwelling."  Woonsocket Code § 12-80.

### III.   Standard of Review

Pursuant to Fed. R. Civ. P. 12(b)(6), "only a complaint that states a plausible claim for relief survives."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  Id.  In ruling on the motion, the Court "must view the stated facts in the light most favorable to the pleader."  In re Credit Suisse First Boston Corp., 431 F.3d 36, 51 (1st Cir. 2005); Henry v. Sheffield, 749 F. Supp. 2d 3, 17 (D.R.I. 2010).  The Court must "accept[] the plaintiff's factual allegations and draw[] all reasonable inferences in the plaintiff's favor."  Maloy v. Ballori-Lage, 744 F.3d 250, 252 (1st Cir. 2014) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  Twombly, 550 U.S. at 556.  A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  Id. (internal citations and punctuation omitted).

### IV.   Law and Analysis

#### A.   Property Interest Protected by Fifth and Fourteenth Amendments

This motion to dismiss focuses on whether Plaintiff had a "property interest" in the condominium unit on Social Street in Woonsocket sufficient to satisfy the first element of the

relevant tests under the Fifth Amendment's just compensation clause and Fourteenth

Amendment's due process clause.  Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1016 n.7

(1992) (as predicate to Fifth Amendment analysis, court must examine "whether and to what

degree the State's law has accorded legal recognition and protection to the particular interest in

land with respect to which the takings claimant alleges a diminution in (or elimination of)

value"); Thomas v. Cohen, 304 F.3d 563, 576 (6th Cir. 2002) ("First, the court must determine

whether the interest at stake is a protected liberty or property right under the Fourteenth

Amendment.") (citing Bd. of Regents v. Roth, 408 U.S. 564, 570-71 (1972)).  The starting point

for the analysis is the well-settled proposition that a constitutionally-protected property interest is

delineated not by the Constitution, but by "existing rules or understandings that stem from an

independent source such as state law."  Webb's Fabulous Pharmacies v. Beckwith, 449 U.S. 155,

161 (1980); Roth, 408 U.S. at 578.  Equally well settled is that a tenancy of some duration,

however short, may create a constitutionally-protected property interest, giving rise to a

requirement of just compensation or due process if that property is taken, or infringed upon, by

the government.  Thomas, 304 F.3d at 578 (tenants residing at women's shelter who paid

monthly fee for right to occupy had property right and could not be evicted without procedural

due process); Ward v. Downtown Dev. Auth., 786 F.2d 1526, 1529 (11th Cir. 1986) (month-to-

month tenancy in subsidized housing terminable only with hearing and offer of alternative

housing constitutes Fifth Amendment property interest); Jeffries v. Ga. Residential Fin. Auth.,

678 F.2d 919, 927 (11th Cir. 1982) (Section 8 tenants have protected property interest under

Fourteenth Amendment in government subsidized leases terminable only for cause).

      Because the contours of a property interest are limned by state law, if the state places

boundaries on the scope of the right it creates, no Fifth Amendment taking or Fourteenth

Amendment due process deprivation occurs after the right lapses by operation of the state law. Texaco, Inc. v. Short, 454 U.S. 516 (1982) (mineral rights that lapsed due to non-use by operation of law do not trigger Fifth Amendment right to just compensation); Devines v. Maier, 728 F. 2d 876, 885-86 (7th Cir. 1984) (because state law limits possessory interest of tenants to habitable dwellings, order that tenants must vacate uninhabitable building does not amount to Fifth Amendment taking); Mills v. Cty. of Lapeer, No. 11-1609, slip op. at 6-13 (6th Cir. Sept. 4, 2012) (because state law converts former owners who stay on after tax foreclosure to trespassers upon receipt of notice to quit, eviction does not implicate property interest under Fourteenth Amendment) (a copy of this unpublished opinion is in the record at ECF No. 9-1 at 1-15) ("Mills").  As the Supreme Court stated in Roth:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.

408 U.S. at 577.

Applying these principles to mere occupants of land, the First Circuit declined to find that members of a squatter community had property rights in homes built on land belonging to the Commonwealth of Puerto Rico in the seminal case of Amezquita v. Hernandes-Colon, 518 F.2d 8 (1st Cir. 1975).  In light of applicable commonwealth law, which provides that "he who builds, plants or sows in bad faith on another's land, loses what he has built, planted or sown without having any right to indemnity," the court held that plaintiffs lacked a protected property interest. Id. at 13 (quoting 31 L.P.R.A. § 1165-66).  The court acknowledged that they might well have procedural rights in that commonwealth law appeared to contemplate that the government should have initiated a judicial proceeding prior to removing the squatters' structures.  The court held that such "[p]rocedural protections do not necessarily determine that a property right exists";

rather, "the important question in determining whether procedural protection defines a property right is whether the protection amounts to a substantive restriction on the ultimate action being challenged." Id. (citing Suckle v. Madison Gen. Hosp., 499 F. 2d 1364, 1366 (7th Cir. 1974)). To focus on this "important question," the court asked a more specific question – whether a hearing could somehow have resulted in the conclusion that these squatters had the right to remain or return. Id. Because the answer was unequivocally negative, the court found that the procedural protections, which would only serve to delay the outcome, could not alter the conclusion that the plaintiffs had no property right under the Fourteenth Amendment. Id.

To establish that she had a property interest recognized by state law, Plaintiff argues that, at all relevant times, she was a tenant pursuant to the Rhode Island Residential Landlord and Tenant Act, R.I. Gen. Laws §§ 34-18-1, *et seq*. With no rental agreement with a true owner of any right to the dwelling, her path to that conclusion is convoluted. First, in reliance on the allegation that she commenced her occupancy in the good faith belief that she was a month-to-month tenant under a legitimate rental agreement, she argues that the Landlord and Tenant Act's definitions of "rental agreement" and "tenant" bring her under the Act's protections. R.I. Gen. Laws § 34-18-11(14) ("'Rental agreement' means all agreements, written or oral . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit"); R.I. Gen. Laws § 34-18-11(17) ("'Tenant' means a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others."). Once she discovered that her rental agreement was a nullity and she stopped paying rent, she contends she became a tenant at sufferance, still under the protection of the Landlord and Tenant Act. Mathison v. Griffin, 67 A.2d 833, 834 (R.I. 1949) ("[A] tenancy by sufferance arises where a person, coming into possession rightfully, holds over without right. And where the owner of a particular estate remains in possession after his estate

has terminated, he may be regarded as a tenant at sufferance.").  Alternatively, she argues that Woonsocket is estopped from denying that she is a tenant protected by the Act because it addressed the immediate compliance order to "All tenants."[10]

Focusing first on the period when she believed she was a tenant, I find there is no support in the language or the spirit of the Landlord and Tenant Act for her argument that she was a tenant, protected by the Act, based on her subjective belief that she had a valid rental agreement. The Landlord and Tenant Act expressly addresses the relationship between a person with the legal capacity to control access to a dwelling unit – a landlord – and a person who has, or seeks to have, an agreement to pay rent to acquire exclusive access – a tenant.  See R.I. Gen. Laws § 34-18-2(b)(1) (purposes of Act to address "the rights and obligations *of landlords* and tenants") (emphasis supplied); GE Capital Asset Mgmt. v. Maltezos, C.A. No. KD 94-842, 1995 WL 941465, at *1-2 (R.I. Super. Ct. Aug. 18, 1995) (for Landlord and Tenant Act to apply, "an agreement must exist between the parties").  Plaintiff tries to side-step this deficit by pointing to the definitions in the Landlord and Tenant Act.  Citing R.I. Gen. Laws § 34-18-11(17), she contends a tenant is someone with a rental agreement; she believed she had a rental agreement; *ergo*, she is a tenant.  However, the plausible facts in her complaint permit the inference only that she did not have an agreement with a landlord; rather, she had an arrangement grounded in fraud, based on her unilateral mistake, which is no agreement at all.  Ahern v. Scholz, 85 F.3d 774, 795

---

[10] Plaintiff cites no cases to support her argument that a property interest may be based on estoppel in these circumstances.  While Rhode Island cases do rely on equitable principles in property disputes, they appear to do so only to reallocate property rights between the victim and perpetrator of fraud or breach of a fiduciary duty.  E.g., Dellagrotta v. Dellagrotta, 873 A.2d 101, 111 (R.I. 2005) (constructive trust appropriate when legal title to property obtained by fraud).  Plaintiff cannot invoke these cases because her complaint is devoid of any suggestion of fraud or breach of fiduciary duty committed by Woonsocket.  In light of the clarity of the pronouncement from the Supreme Court that a constitutionally-protected property interest must derive from "a legitimate claim of entitlement," Roth, 408 U.S. at 577, and that it cannot be based solely on an "abstract need or desire," or "a unilateral expectation," id., I reject the proposition.  In any event, deployment of estoppel is inapt in this case because the equities tip strongly against burdening a municipality acting to protect public health and safety with the obligations of just compensation and due process simply because its notice was mistakenly addressed to "tenants" and not to "tenants and occupants."  Plaintiff's estoppel argument will not be addressed further in the report and recommendation.

(1st Cir. 1996) (unilateral mistake coupled with fraud vitiates agreement).  Her belief, however

subjectively well-founded, cannot create a "legitimate claim of entitlement" based on a rental

agreement.  Roth, 408 U.S. at 577.  The Rhode Island Supreme Court has specifically rejected

the proposition that the honest belief that the claimant possesses a lawful tenancy converts a

trespasser into a tenant.  Allen v. Keily, 24 A. 776, 776 (1892) ("Possession of real estate is

either rightful or wrongful.").  Thus, even during the early months when she thought she was a

tenant with a rental agreement, she did not have that status within the meaning of the Landlord

and Tenant Act.

Once she knew she was not a tenant and, arguably, became a tenant at sufferance,

Plaintiff plainly falls outside the protections of the Landlord and Tenant Act.  Tenancy at

sufferance is addressed by a different statute, R.I. Gen. Laws § 34-18.1-1, *et seq.*, whose scope

specifically "exclude[es] residential properties governed by the Residential Landlord and Tenant

Act."  The cases addressing the distinction between the tenancies confirm that an occupant or

tenant at sufferance is not a tenant within the meaning of the Landlord and Tenant Act.  E.g.,

Tambor v. Miller, 792 A.2d 744, 745-46 (R.I. 2002) (girlfriend of tenant not party to rental

agreement and cannot recover under Landlord and Tenant Act despite long term occupancy).

Even if she was not entitled to the protections of the Landlord and Tenant Act, Plaintiff

argues that she nevertheless had a property interest under Rhode Island law as a tenant at

sufferance.  Rhode Island law has long recognized that one who comes into possession rightfully,

but then holds over without right, can become a tenant by sufferance.  Mathison, 67 A. 2d at 834;

Johnson v. Donaldson, 20 A. 242, 243 (R.I. 1890).  Setting aside the cases dealing with tenants at

sufferance who were formerly true owners, e.g., Hebden v. Antonian, 518 A.2d 1362, 1362 (R.I.

1986) ("mortgagor in possession following a foreclosure sale is a tenant at sufferance"), Rhode

Island has consistently held that the status of a holdover tenant is presumptively that of trespasser, but that he or she may become a tenant at sufferance at the option (or "sufferance") of the landlord.  Ucci v. Mancini, 387 A.2d 1056, 1059 (1978) (tenant who remains after lease term expired is deemed to be a trespasser); Providence Cty. Sav. Bank v. Hall, 13 A. 122, 124 (R.I. 1888) (landlord may convert holdover trespasser to tenant through unreasonable delay in proceeding against him, or through acts recognizing him as tenant).  Thus, it is the landlord who "has the power to determine the status of holdover tenants"; whether the landlord's actions have converted a trespasser into a tenant at sufferance or a tenant with a new term of time is a fact to be determined in light of the surrounding circumstances.  Gooding Realty Corp v. Bristol Bay CVS, Inc., No. CIV. A. 99-4987, 2001 WL 1255504, at *4 (R.I. Super. Ct. Oct. 5, 2001).

The legal indicia of the tenancy at sufferance are set by statute.  First, such a tenant remains obligated to pay rent.  R.I. Gen. Laws § 34-18.1-3 ("Persons in possession of lands or tenements covered by this chapter as tenants by sufferance shall be liable to pay rent for such time as they may occupy or detain the same.").  Second, the tenancy may be immediately terminated on written notice.  R.I. Gen. Laws § 34-18.1-2 ("Tenants of lands or tenements at will or by sufferance covered by this chapter shall quit upon notice in writing from the landlord at the day named therein."); Rourke v. Fraser, 110 A. 377, 378 (R.I. 1920) (tenant at sufferance shall quit on written notice on the day named); Wood v. Page, 54 A. 372 (R.I. 1903) (tenant on oral lease who held over became tenant at sufferance until notice to quit served).  If he or she does not leave on the day named in the notice, the tenant at sufferance becomes a trespasser.  Mitchell v. Hymen, 111 A. 369, 370 (R.I. 1920); see Taylor v. O'Brien, 34 A. 739 (R.I. 1896) (wife who stayed on after husband abandoned her and sold property is tenant by sufferance who became trespasser when owner gave notice to terminate her right to occupy).  Otherwise, the tenancy at

sufferance lacks the indicia of a property interest.  Cf. Gallagher v. Zoning Bd. of Review of City of Pawtucket, 186 A.2d 325, 328 (R.I. 1962) (tenant at sufferance does not have sufficient interest in realty to support application for zoning variance).

Applying these principles to Plaintiff's facts compels the conclusion that she was not a tenant at sufferance, but rather was a trespasser, albeit one who was acting in good faith when her occupancy commenced.  While she may have been the victim of fraud, nonetheless, she did not come into possession of her unit rightfully *ab initio*, which is the necessary foundation for becoming a tenant at sufferance.  She never had the requisite right to occupy the condominium unit to the exclusion of others because the two scofflaws with whom she dealt had no such right to confer.  See Mills, slip op. at 9-10 ("For a tenancy to become a tenancy by sufferance, it must originally have been created by agreement of the parties, not by an act of law.") (quoting 2 Cameron, Michigan Real Property Law § 20.6 at 1098).  Her decision to stop paying the rent once she became aware of the fraud confirms that she was not a tenant at sufferance, who has a continuing obligation to pay rent.  R.I. Gen. Laws § 34-18.1-3.  Moreover, she had no relationship with any landlord or true owner, so the second element of a tenancy by sufferance – the decision of the landlord not to treat a former tenant as a trespasser – is also missing.

What remains are Plaintiff's rights, *vel non*, flowing from her status as an occupant of the dwelling unit.  Even if she is neither a tenant under the Landlord and Tenant Act nor a tenant at sufferance, she argues that, as an occupant, she had a property right based on the existence of procedural protections that define the scope of the right to occupy.  Specifically, she contends that she was unconstitutionally deprived of her property right to occupy when Woonsocket failed to afford her ten-days' notice, a hearing, and a timely and appropriate offer of alternative

housing.[11]  She also complains that Woonsocket cleaned and repaired the building but did not

allow her to resume occupancy of the unit.

For starters, Plaintiff's claim of a state-law property right to occupy the Social Street unit

is not viable because the Rhode Island Occupancy Code provides that there is no right to occupy

an uninhabitable building.  R.I. Gen. Laws § 45-24.3-13 ("No person shall occupy as owner or

occupant, or let to another for occupancy, any vacant dwelling or nonresidential structure, unless

it and the premises are clean, sanitary, fit for human occupancy . . . .").  The same principle,

under the law of Wisconsin, caused the court in Devines v. Maier to reject the property interest

claims of tenants who were ordered temporarily to vacate an uninhabitable dwelling.  728 F.2d at

886.  Despite the finding that they were undeniably tenants, the court nevertheless also found

that the municipality's determination of uninhabitability – made in furtherance of its duty to

protect public health and safety – caused the right to occupy to lapse, not through an action of the

state, but due to the inaction of the owner, the tenants or both.  Id.  Because the right to occupy

cannot exist as long as the structure is uninhabitable, no Fifth Amendment deprivation occurred

---

[11] Although not addressed by the parties, I am compelled to note the troubling lack of plausibility of both Plaintiff's argument that she was deprived of her right to a hearing and her claim that she was denied her right to ten-days' notice.  As to a hearing, state law does not mandate that a hearing must be held if no one asks for one.  Plaintiff had the right to and was afforded an immediate informal conference with Defendant Binette.  R.I. Gen. Laws § 45-24.3-21(a)(2) (informal conference with enforcing officer first step in hearing process).  At all times, she had the right to appeal the determination by filing a petition in the housing board of review.  R.I. Gen. Laws § 45-24.3-21(b); Woonsocket Code §§ 12-47, 12-93.  Neither the Rhode Island statute nor the Woonsocket ordinance requires that an immediate compliance order must advise occupants of the appeal process; nor is such notice constitutionally mandated.  In re Arch Wireless, Inc., 534 F.3d 76, 83 (1st Cir. 2008) (due process merely requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").  As to the amount of notice, when the enforcing officer determines that a building's condition constitutes an emergency, whether there is any delay is based on the seriousness of the emergency.  Woonsocket Code § 12-47.  By issuing an immediate compliance order with only five-days' notice based on "serious sanitation issues," Defendant Binette was plainly acting appropriately.  R.I. Gen. Laws § 45-24.3-19(b)(2) (uninhabitable building must be vacated "within a reasonable time"); Woonsocket Code § 12-47 (in emergency, order to vacate may be effective immediately or in such time as chief inspector shall deem reasonable under circumstances).

By contrast, Plaintiff's challenge regarding Woonsocket's offer of alternative housing is potentially viable under state law.  Her complaint plausibly alleges that Woonsocket Code § 12-80 and R.I. Gen. Laws § 45-24.3-19(d), as interpreted by the Superior Court's order in Gomes (ECF No. 1-1 at 3), were violated because the offer of alternative housing was not made until after she was forced to leave the unit, and the offer was for only five days at the Woonsocket Motor Inn.

and the tenants had no right to just compensation.  Id.; see United States v. Rounds, No. 10-CR-239S, 2015 WL 5156872, at *5 (W.D.N.Y. Sept. 2, 2015) (society does not deem reasonable occupation of property city declares uninhabitable; unlawful occupant of nuisance property has no Fourth Amendment privacy expectation); Olvera v. City of Modesto, 38 F. Supp. 3d 1162, 1171-72 (E.D. Cal. 2014) (despite plaintiff's mistaken belief that owner gave permission to occupy, obvious uninhabitability of building defeated objectively reasonable expectation of privacy).  Significantly, Plaintiff cites to no cases, and this Court found none, that recognize a property-based constitutional deprivation arising from missteps in the implementation of state-law procedures when occupants or squatters are removed from an unfit dwelling to protect their own health and safety.  The absence of a right to occupy an uninhabitable building precludes Plaintiff – whether she was a tenant at sufferance, occupant or trespasser – from claiming a property interest derived from the right to occupy.

Plaintiff's secondary argument – that her property interest based on the right to occupy revived after the building was cleaned and repaired so that Woonsocket should have let her return – founders on the cases that uniformly reject property-interest-based claims by mere occupants, squatters, hold-overs and trespassers.  For example, in Abrams v. Morial, 968 F. Supp. 1106 (E.D. La. 1997), the court considered the rights of occupants of an historic property who claimed to have had the permission of the former owner to remain.  The court noted that "it is unclear how the plaintiffs' occupancy of a piece of property in which they have no legal right to remain can constitute a property interest protected by the U.S. Constitution, [in that] they . . . were not the owners . . .  and had no contractual right under a lease – through either a mutual understanding or otherwise – to occupy the property."  Id. at 1111.  In light of their status as mere occupants of the property or "more simply stated, squatters," the court looked to

Amezquita, 518 F.2d at 13, and rejected the proposition that the procedural safeguards protecting squatters from immediate eviction vested in these plaintiffs a constitutionally-protected interest in the property.  Abrams, 968 F. Supp. at 1111-12; see De Villar v. City of New York, 628 F. Supp. 80, 84 (S.D.N.Y. 1986) (New York law requiring ten-day notice before summary eviction of squatters does not give rise to property interest even when city was building owner).  With no relationship to the real estate beyond that of occupant or trespasser, Plaintiff cannot assert a future right to occupy, even if the building subsequently became habitable again.

To shore up her claim of a property interest, Plaintiff cites to the decision of the Eleventh Circuit in Ward v. Downtown Development Authority, 786 F.2d 1526.  Ward does not advance her cause.  It addressed the claims of plaintiffs who were month-to-month tenants in state-owned subsidized housing slated for a renewal project; unlike Plaintiff, there is no question that they possessed a property interest as *bona fide* tenants.  Id. at 1529.  Further, unlike Woonsocket, which acted to avert an immediate peril to health and safety, the Development Authority in Ward evicted its tenants in order to convert the building to a performing arts center.  Id.  Because the applicable statute mandated that there must be a hearing whether it was requested or not, and required a "feasible method" for alternative housing before the tenants could be displaced for a renewal project, the court found that they retained a property interest with a right to occupy as month-to-month tenants until those requirements were satisfied.  Id. at 1530.

Nor is Plaintiff's argument supported by Walls v. Giuliani, 916 F. Supp. 214, 220 (E.D.N.Y. 1996).  In Walls, the court addressed the claim that the City of New York deliberately and actively encouraged squatters to occupy a habitable city-owned property.  Id. at 220.  The court found that the City's active acquiescence in the squatter's continued occupancy was sufficient to convert them to tenants at sufferance, with a property interest in the right to

continued occupancy, at least for the thirty-day notice period required by New York law.  The

City was not acting because of any public health crisis.  The court emphasized that its decision

was based on the plaintiffs' factual allegations that the City, as owner and landlord, had first

actively encouraged them to remain and subsequently sought to evict them so it could recover

possession of its property.  Without those allegations, the court would have held that these

occupants lacked any property interest.  Id. at 220, 222-23 ("Although the Constitution has been

much trivialized, it has not progressed to the point where every notice provision of state property

law has become a matter of constitutional right.") (quoting De Villar, 628 F. Supp. at 84).

        In the end, the Court must return to the question framed in Amezquita: is it plausible that

a hearing would have accomplished anything more than a delay?  See 518 F.2d at 13.  That is, is

it plausible that a hearing would have resulted in a finding that Plaintiff was entitled to remain in

the condo or to return to it after the building was rehabilitated?  The answer to these questions is

no.[12]  As an occupant of an uninhabitable building, she had no right to occupy or remain under

any circumstances; as a trespasser, she had no right to stay if the finding of uninhabitability was

incorrect or to return in the event that repairs rendered the building habitable again.  No hearing

would have altered these realities.  That answer compels my conclusion – Plaintiff did not have a

constitutionally-protected property interest in her occupancy of the condominium unit sufficient

to trigger rights pursuant to the Fifth and Fourteenth Amendments.  Because her complaint does

---

[12] Plaintiff tacitly concedes that a hearing would ultimately have been futile, arguing only that a hearing would at
least have delayed the execution of the order to vacate and possibly could have led to a decision not to condemn the
building, allowing her to remain long enough to find a new apartment.  Citing Cleveland Bd. Of Educ. v.
Loudermill, 470 U.S. 532 (1985), she asserts that the Court should ignore the futility of the hearing because "the
right to a hearing does not depend on a demonstration of certain success."  Id. at 544.  Plaintiff misreads Loudermill
– it holds that the claimants had to demonstrate that they had at least "plausible arguments" such that one could not
predict the outcome of the hearing, but did not have to prove that they would certainly prevail.  Id.  As Amezquita
teaches, futility – in that a hearing cannot restore the right to occupy when no such right exists – is something the
court can and must consider.  518 F. 2d at 13.

not plausibly allege that she was deprived of a constitutionally-protectable property interest, I recommend that her federal claims be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).[13]

        B.     <u>Substantive Due Process</u>

Plaintiff's substantive due process claim fails because she has not plausibly pled governmental action so oppressive and arbitrary as to shock the conscience. <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952). The complaint alleges that she squatted rent-free for more than a year in a building deteriorating, at least in part, due to sanitation issues caused by the occupants who left trash and debris in the halls and yard. When Woonsocket focused on the sanitation and other problems, it found an emergency and issued its order to vacate. Plaintiff was given five-days' notice and the contact information necessary to initiate her right to an informal conference to challenge the determination pursuant to R.I. Gen. Laws § 45-24.3-21(a). She took no action to remove her possessions until after the informal conference with Defendant Binette when he denied her request for more time to pack up. She did not seek the hearing available to her by filing a petition with the housing board; she blames Woonsocket for failing to tell her that such a procedural remedy was available. Woonsocket offered her five days of alternative housing on the same day that she vacated her dwelling, so that she and her family never passed a night without shelter. However, Plaintiff claims that offer fell short in that she learned of the option only through the intervention of an interested journalist, and the offer was not made until after her unit was boarded up. Whether the offer was also flawed because it provided for fewer than thirty days of alternative housing is a contested issue of state law. Instead of pursuing the housing board hearing available to her under state law, she opted to file suit in this Court.

---

[13] With the federal claims dismissed, there is no reason for this Court to retain her state law claims, particularly where they involve potentially complex interpretations of state and municipal law regarding the scope of the right to alternative housing. Accordingly, I also recommend that all of Plaintiff's state law claims be dismissed without prejudice. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966).

The most troubling of Plaintiff's factual allegations, read with all inferences tipped in Plaintiff's favor, include that Woonsocket cleaned up the building for less than $3000, VC ¶ 54, after which Plaintiff's condominium became habitable again, yet Woonsocket refused to allow her to return, VC ¶ 55; that she was forced to remain in the hotel with no kitchen at her own expense, and otherwise would have been homeless, VC ¶ 47; and that police were present when the building was condemned, so that she would have been arrested if she tried to stay, VC ¶ 41.[14] None is close to what our Circuit has found to be a conscience-shocking deprivation of due process.  See, e.g., Marrero-Rodriguez v. Municipality of San Juan, 677 F.3d 497, 502 (1st Cir. 2012) (shooting trainee in the back enough to shock the conscience); Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009) (seizures and cruel killings of pet cats and dogs by slamming them into van and hurling them off bridge may be enough to shock the conscience); Hasenfus v. LaJeunesse, 175 F.3d 68, 71 (1st Cir. 1999) (school staff's conduct that resulted in child's attempted suicide, leading to coma and permanent impairment, may be enough to shock the conscience).  In a case where the facts were more troubling than those alleged here, a substantive due process claim was disposed of at summary judgment based on the holding that no fact finder could find the circumstances shocking or oppressive.  Foley v. Town of Lee, 871 F. Supp. 2d 39, 51-52 (D.N.H. 2012) (although plaintiffs were denied procedural due process when officers threatened them and their children with arrest unless they immediately left their camper, such actions simply were not close to being "brutal and inhumane" enough to shock conscience).

Based on the foregoing, I recommend that the Court dismiss Plaintiff's claim that she was deprived of substantive due process under the Fourteenth Amendment.  Torromeo v. Fremont,

---

[14] Far more troubling is Plaintiff's conclusory allegation that Woonsocket has a policy or practice of using the police to force tenants out of their homes with no notice or opportunity for a hearing.  VC ¶ 63.  However, the complaint offers no plausible facts to support this claim.  Plaintiff herself, as a non-tenant who received five-days' notice, had an opportunity for a hearing in the housing board of review, and was offered five days of alternative housing, lacks standing to press such a claim.

NH, 438 F.3d 113, 118 (1st Cir. 2006) (to find deprivation of substantive due process, "threshold for establishing the requisite abuse of government power is a high one indeed").

### C.   Official Capacity Suit Against Defendant Binette

It is long settled that a municipality is a person subject to suit for damages and injunctive relief under § 1983.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 62 (1989).  It is equally clear that a suit against a city official in his or her official capacity is not a suit against the official but rather is a suit against the official's office and is redundant of the claim against the city, as long as the city is joined.  Kentucky v. Graham, 473 U.S. 159, 165 (1985); Brandon v. Holt, 469 U.S. 464, 471 (1985).  Joinder of the government official is necessary to make him/her subject to a damage claim but such a claim may be asserted only if he is sued in his individual capacity.  Reis v. Lombardi, No. C.A. 15-423ML, 2016 WL 1626664, at *1-2 n.1 (D.R.I. Mar. 16, 2016), adopted, No. C.A. 15-423-ML, 2016 WL 1611116 (D.R.I. Apr. 21, 2016); Kucera v. Tkac, No. 5:12-CV-264, 2013 WL 1414441, at *4 (D. Vt. Apr. 8, 2013).  Because Defendant Binette is sued solely in his official capacity, his joinder duplicates the joinder of the City of Woonsocket.  Courts examining this issue have consistently held that, in such circumstances, the official capacity individual defendant may be dismissed without prejudice.  Reis, 2016 WL 1626664, at *2 n.5; Stancati v. Cty. of Nassau, No. 14-CV-2694(JS)(ARL), 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015); Vondrak v. City of Las Cruces, No. CIV-05-0172 JB/LFG, 2009 WL 1300945, at *2 & n.1 (D.N.M. Mar. 30, 2009); see also Young v. City of Providence, 404 F.3d 4, 10 n.1 (1st Cir. 2005) (official-capacity municipal liability claim against police chief was treated as functional equivalent of claim against city).

I recommend that the official capacity claims against Defendant Binette be dismissed without prejudice.

## V.     Conclusion

Based on the foregoing analysis, I recommend that Defendants' motion to dismiss (ECF No. 6) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 18, 2017